*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1187**

In the Matter of the Welfare of the Children of:
S. K. and N. K., Parents.

**Filed January 22, 2024**
**Affirmed**
**Larkin, Judge**

Martin County District Court
File No. 46-JV-23-40

Ryan A. Gustafson, Frundt, Lundquist & Gustafson, Ltd., Blue Earth, Minnesota (for appellant S.K.)

Taylor L. McGowan, Martin County Attorney, Amanda Heinrichs-Milburn, Assistant County Attorney, Fairmont, Minnesota (for respondents Faribault and Martin Counties)

Allison Hennager, Guardian ad Litem, Fairmont, Minnesota

Considered and decided by Frisch, Presiding Judge; Johnson, Judge; and Larkin, Judge.

**NONPRECEDENTIAL OPINION**

**LARKIN**, Judge

Appellant-mother challenges the termination of her parental rights, arguing that the record does not support the district court's determinations that a statutory basis for termination was proved at trial and that the county made adequate efforts to reunite the family. Appellant also argues that the district court's findings regarding the children's best interests are inadequate and lack record support. We affirm.

## FACTS

Appellant SK is the mother of three minor children: JK, born in 2014; PK, born in 2015; and MK, born in 2017.[1] In March 2023, Faribault and Martin County Human Services (the county) petitioned to terminate mother's parental rights to the three children.

Mother has a long history of substance abuse. From 2019 to 2021, her children were the subjects of a child-in-need-of-protection-or-services (CHIPS) case, which was based on mother's continued use of chemicals. Additionally, around 2013 or 2014, in a separate juvenile-protection case, mother's custodial rights to her eldest child, QF, were transferred to the child's father, BF. One of the issues in that case was mother's continued use of chemicals.

Mother also has a history of abusive relationships. She lived with MB, who used methamphetamine and was a negative influence on her ability to remain sober. And she remained in close contact with the children's father, NK, despite his long history of abusing mother and the children. She also continued to allow NK to visit the children despite being told that he forced two of the children to smoke marijuana.

While in mother's care, JK and PK struggled in school due to poor attendance. In 2021, both children had numerous absences and were the subjects of individualized educational plans. It was later determined that JK's struggles were due to his poor attendance and were not caused by a learning disability.

---

[1] NK is the father and was married to mother at the time of trial. He consented to the termination of his parental rights, and he has not participated in this appeal.

On February 23, 2022, law enforcement executed a search warrant at mother's residence, where she lived with MB and her three children. Law enforcement found methamphetamine, paraphernalia, and "fake urine" in mother's home. The children were placed in protective custody. At the time of their removal, mother admitted that she had used fentanyl the day before. Her urine test was "presumptively positive for methamphetamines, amphetamines, THC[,] and benzodiazepines."

The county filed a CHIPS petition, and on April 5, 2022, the district court adjudicated the children in need of protection or services. On April 7, 2022, mother signed case plans regarding the three children. The case plans contained four goals for mother: (1) a safe-and-stable living environment, (2) long-term sobriety, (3) address her mental health, and (4) meet the children's medical, developmental, and emotional needs. To meet those goals, the case plans required, among other things, that mother abstain from the use of mood-altering chemicals, submit to random drug testing, ensure only safe and sober individuals were allowed in the home, work with a recovery specialist, obtain a full psychological evaluation, participate in individual therapy, and attend all supervised visits with the children.

Mother struggled with her sobriety. In April and May of 2022, she tested positive for methamphetamine, and she admitted to a recovery specialist that she was unable to go more than two days without using chemicals. In early May, she signed up for inpatient treatment at New Life. The program was 30 days long, but mother left within a week. Around the beginning of June, she entered a sober living facility, House of Hope, and she began outpatient treatment at New Beginnings. But mother left House of Hope after

3

approximately one month. In July, she tested positive for methamphetamine. Mother admitted that she used methamphetamine at the end of August 2022, and she refused to continue working with the recovery specialist, even though the case plans required her to do so.

In September 2022, mother tested positive for methamphetamine, and the following month she began participating in Family Dependency Treatment Court (FDTC), which required her to submit to random drug testing. She missed some of those tests, tested positive for prohibited substances, and provided diluted samples. Mother was unsuccessfully discharged from the program.

After a period of sobriety, mother tested positive for methamphetamine again in December 2022. In February 2023, she was unsuccessfully discharged from outpatient treatment with New Beginnings with the recommendation that she attend a "high intensity residential chemical dependency treatment program." Also in February 2023, mother violated her probation by failing to abstain from mood-altering chemicals and by failing to complete chemical-dependency treatment, and she was sentenced to serve 30 days on electronic home monitoring. In March 2023, mother entered inpatient treatment at New Life, and she completed the program after approximately 21 days.

In May and June of 2023, the district court held a trial on the petition to terminate mother's parental rights. Mother tested positive for THC on the first day of trial and did not have a prescription for marijuana at that time.

On July 24, 2023, the district court filed an order terminating mother's parental rights to the three children. The district court relied on a single statutory basis, Minn. Stat.

4

§ 260C.301, subd. 1(b)(5) (2022), which permits termination of parental rights if reasonable efforts have failed to correct the conditions that led to out-of-home placement.

Mother appeals.

## DECISION

## I.

Mother argues that the district court's termination order is not supported by sufficient evidence. Specifically, she asserts that there was insufficient evidence to prove the statutory ground on which the district court relied.

Minnesota courts will terminate parental rights "only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). The petitioner bears "the burden of producing clear and convincing evidence that . . . [a] statutory termination ground[ ] exists." *In re Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988). A district court's decision in a termination proceeding must be based on evidence concerning the conditions that exist at the time of the termination. *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007), *rev. denied* (Minn. July 17, 2007). Termination of a parent's rights is intended for those situations in which it appears "that the present conditions of neglect will continue for a prolonged, indeterminate period." *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn. 1980).

Minnesota law sets forth multiple statutory grounds for termination of parental rights. *See* Minn. Stat. § 260C.301, subd. 1(b) (2022). In a termination appeal, an appellate court examines the record to determine whether the district court applied the appropriate statutory criteria. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). In

reviewing a termination order, we review the underlying findings of fact for clear error; we review a determination that a statutory ground for termination exists, as well as the court's ultimate decision to terminate parental rights, for an abuse of discretion. *In re Welfare of Child of J.H.*, 968 N.W.2d 593, 600 (Minn. App. 2021), *rev. denied* (Minn. Dec. 6, 2021). We will affirm a termination order if at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, so long as the department made reasonable efforts to reunite the family if reasonable efforts were required. *In re Welfare of Child. of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005).

The district court terminated mother's parental rights under Minn. Stat. § 260C.301, subd. 1(b)(5), which authorizes termination of parental rights if "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." It also sets forth a presumption that reasonable efforts have failed if certain circumstances are proved. Minn. Stat. § 260C.301, subd. 1(b)(5). The district court relied on the statutory presumption and made detailed findings explaining its determination that this statutory basis for termination had been proved.

Mother concedes that the district court "set forth factual findings and [c]onclusions that looked at the statutory factors both in the statutory conditions and reasonable efforts" by the county. However, she argues that the district court failed to analyze "the projected permanency of those statutory conditions." Specifically, she argues that the district court did not analyze the progress that she made "and the potential that the progress would

6

continue." She also argues that the district court "primarily relied on the past events" and failed to consider "the anticipated permanency of the conditions."

In its best-interest analysis, the district court specifically found that it had "seen little indication that [m]other's behaviors will change." The district court acknowledged that mother had "not tested positive for methamphetamines in 2023." But the court reasoned that mother had been unable to maintain her sobriety throughout the pendency of the underlying case, "remained in close relationships with individuals who threatened her sobriety and who abused the children," and "rejected relationships with individuals who supported her and the children in healthy, loving ways." The district court noted mother's repeated use of methamphetamine; her continued use of marijuana, including her positive test at trial; that she was in jail, on home monitoring, or in treatment during much of her sobriety; that her inpatient treatment program was only 21 days long; and her continued association with MB and NK, who were not positive influences on her stability or sobriety.

Prior history can provide context for existing circumstances. *See In re Welfare of S.Z.*, 547 N.W.2d 886, 894 (Minn. 1996) ("If [appellant] cannot care for himself on a sustained basis, it follows that he cannot care for a child."). The district court considered mother's inability to demonstrate long-term sobriety, to establish a supportive network, and to provide stability for the children. That history supports the district court's finding that there was little indication that mother's behavior would change and shows that the district court considered the projected permanency of the statutory circumstances justifying termination. Thus, the district court did not abuse its discretion in concluding that a statutory basis to terminate mother's parental rights had been proved.

7

**II.**

Mother challenges the district court's finding that the county made reasonable efforts to reunify her with her children.

The district court must make "specific findings" in every termination proceeding that either "reasonable efforts to finalize the permanency plan to reunify the child and the parent were made including individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family" or "reasonable efforts for reunification [were] not required." Minn. Stat. § 260C.301, subd. 8 (2022).

In determining whether the county made reasonable efforts, the district court must consider whether the county offered services that were (1) selected in collaboration with the family; (2) tailored to the child's and family's needs; (3) "relevant to the safety, protection, and well-being of the child"; (4) "adequate to meet the individualized needs of the child and family"; (5) "culturally appropriate"; (6) "available and accessible"; (7) "consistent and timely"; and (8) "realistic under the circumstances." Minn. Stat. § 260.012(h) (2022). We review for clear error a district court's findings on the county's reasonable efforts. *In re Welfare of Child. of J.C.L.*, 958 N.W.2d 653, 658 (Minn. App. 2021), *rev. denied* (Minn. May 12, 2021); *see In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (stating that we review the district court's factual findings for clear error).

In finding that the county made reasonable efforts, the district court thoroughly addressed each of the applicable factors and made detailed findings regarding the efforts made by the county.

Mother asserts that the county failed to help her obtain a full psychological evaluation and argues that there was little evidence that the county made referrals for such an evaluation. Mother's case plan required a full psychological evaluation, and mother only received a diagnostic assessment. According to the case manager, mother indicated that her therapist could do the evaluation. Subsequently, mother informed her case manager that she had not completed the evaluation, and the case manager gave mother a list of mental-health service providers that could do the evaluation. One of mother's case managers testified that she told mother that she could obtain an evaluation at Nystrom & Associates in Mankato. This record does not support mother's assertion that the county did not reasonably assist her to obtain a psychological evaluation.

Mother also asserts that the county failed to help her obtain family therapy. The children's therapist testified that after initially refusing mother's request for family therapy, he eventually informed his staff that he was ready to begin family therapy with mother. But he was unsure if that message was "translated" to the county. He further testified that the county submitted releases in the fall of 2022 for that therapy to occur. Mother's case manager testified that it was difficult to contact the children's therapist, but she was informed that he was ready for family therapy in December. The case manager was unsure why family therapy did not start. The district court found that:

9

> The record shows that [the county] attempted to set up therapy between [m]other and the children. It is unclear why that therapy ultimately did not occur. Mother implied that it was [the county's] fault. [The county] indicated that [it] did everything necessary on [its] end, and [m]other must have just not set up the appointments. [The county] and [m]other agreed that [the therapist] was difficult to communicate with. *While therapy could have improved [m]other's relationship with the children, it likely would not have affected many of the other ongoing concerns regarding [m]other's sobriety and refusal to provide a safe environment.*

(Emphasis added.)

As the district court's last observation indicates, the lack of family therapy did not constitute a failure to provide reasonable reunification efforts because there is no showing that family therapy would have corrected the root cause of the children's out-of-home placement: mother's long-standing chemical dependency and resulting failure to provide a safe home for her children. Indeed, family therapy was not a component of mother's case plan.

Finally, mother asserts that the county failed to meet the therapeutic needs of the children. But the independent clinical social worker, who provided therapy for NK and PK two to four times per month starting in August 2022, testified that he "saw progress" in NK and PK.

In sum, we discern no error in the district court's reasonable-efforts findings.

**III.**

Mother contends that the district court failed to make sufficient findings regarding the children's best interests.

10

If a statutory ground for termination of parental rights is proved, "the best interests of the child must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2022). Thus, a district court's order terminating parental rights must include a finding that termination is in the child's best interests. *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009). "The 'best interests of the child' means all relevant factors to be considered and evaluated." Minn. Stat. § 260C.511(a) (2022).

A best-interest analysis requires consideration of three factors: "(1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004) (quotation omitted); *see* Minn. R. Juv. Prot. P. 58.04(c)(2)(ii) (requiring the district court to address these factors in a termination proceeding). Although the interests of the parent and child must be balanced, this "does not mean that the interests of the parent and the child are weighed equally." *In re Welfare of Udstuen*, 349 N.W.2d 300, 304 (Minn. App. 1984). The best interests of the child are the paramount concern. Minn. Stat. § 260C.301, subd. 7; *In re Child of P.T.*, 657 N.W.2d 577, 583 (Minn. App. 2003), *rev. denied* (Minn. Apr. 15, 2003).

We review the district court's determination that termination is in the children's best interests for an abuse of discretion. *J.H.*, 968 N.W.2d at 600. To be adequate, best-interest findings must facilitate effective appellate review, provide insight into which facts or opinions were most persuasive, and demonstrate comprehensive consideration of the statutory criteria. *See In re Welfare of M.M.*, 452 N.W.2d 236, 238-39 (Minn. 1990) (discussing the inadequacy of the district court's findings in the context of placement

following a termination of parental rights). However, a district court's best-interest findings need not "go into great detail." *W.L.P.*, 678 N.W.2d at 711.

The district court addressed each of the best-interest factors. As to the children's interests, the district court found:

> In this case, the children have an interest in maintaining the relationship. [JK] and [PK] testified that they would like to be returned to [m]other's care, and they regularly told their professional providers the same. [MK] was too young to testify, but she also reported to providers that she would like to live with [m]other. However, the children also qualified that desire on [m]other's sobriety. [PK] additionally testified that he wanted to live with [m]other because she does not enforce rules. [JK] testified that he wanted to live with [m]other but only feels a little safe there, because she does bad things. The children are additionally too young to form decisions based on what is best for their health and development.

As to mother's interests, the district court found:

> Mother expressed a strong interest in maintaining her relationship with her children. She regularly maintained visitation with the children throughout the out-of-home placement plan and continuously pushed for more visitation and unsupervised visitation. However, her actions toward her sobriety and which relationships in her life she chose to maintain do not support that interest.

Finally, as to the competing interests, the district court found:

> The children have had little stability and suffered significant trauma due to [m]other's substance abuse, inability to support the children's developmental and emotional needs, and relationships with unsafe individuals. Throughout the pendency of the CHIPS case, [m]other was unable to maintain her sobriety. She additionally remained in close relationships with individuals who threatened her sobriety and who abused the children. She maintained those negative relationships and rejected relationships with individuals who supported her and the children in healthy, loving ways. The children are not safe

12

with [m]other while she maintains the priorities she does, and the [c]ourt has seen little indication that [m]other's behaviors will change.

The district court ultimately determined that "the children's interests in safety and security outweigh any interest [m]other has in maintaining her relationship with them."

Mother argues that "[t]he record is insufficient and lacking in pertinent information as to what is the children's best interests or factors that the court should apply in its analysis." She further argues that "[t]he record contains conclusory statements about the best interests but lack[s] detailed and required information."

Mother's argument ignores a record showing that mother has been using methamphetamine since the age of 12 and continued to struggle with substance abuse for eight months after the children were placed in protective custody. The record also shows that NK and PK suffered from attention-deficit-hyperactivity disorder, engaged in emotional outbursts, lacked developmental support in mother's care, and expressed concern about mother's substance use. Testimony indicated that mother continued to make poor decisions regarding relationships with unsafe individuals. She admitted at trial that father is an abusive alcoholic and an unsafe parenting option. She also admitted that the children told her that father made them smoke marijuana. Yet, she admitted that she had discussed reconciling with father. Mother suspected that MB was still using methamphetamine, yet she admitted that she saw him in the weeks prior to trial.

The record supports the district court's best-interest findings. And those findings adequately convey the reasons why the district court ultimately determined that termination was in the children's best interests. In sum, the children's interests in a safe, stable home

13

where their needs are met outweighed mother's interest in maintaining the parent-child relationship.

**Affirmed.**